1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JERMAINE SLAUGHTER

               Plaintiff,

     v.

STEWART ENTERPRISES, INC.; THE
NEPTUNE SOCIETY, INC.;  APOLLO
CREMATORIUM; and DOES 1-100,
inclusive,

               Defendants.

_____/

No. C 07-01157 MHP

**MEMORANDUM & ORDER**
**Re: Motion to Compel Arbitration and**
**Stay Action**

     Plaintiff Jermaine Slaughter filed a complaint in Superior Court against defendants Stewart Enterprises, Inc. ("STEI"); The Neptune Society; Apollo Crematorium ("Apollo"); and unnamed defendants Does 1–100, alleging violations of state and federal law relating to his employment.  The case was subsequently removed to this court.  Now before the court is defendants' motion to stay the instant action and to compel arbitration.  The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

BACKGROUND[1]

     Plaintiff Jermaine Slaughter was employed by defendant Apollo Crematorium from approximately June 2000 to November of 2006.  Slaughter Dec. ¶ 2.  He also briefly worked for defendant Neptune Society of Northern California.  Id.  Apollo is owned by defendant STEI, a company which owns and operates funeral homes, cemeteries and crematories through the United States.  STEI acquired Apollo Crematorium in 1997 as part of the acquisition of Apollo's parent

company, defendant Sentinel Cremation Societies d/b/a Neptune Society of Northern California.

The present dispute arises out of Slaughter's employment at Apollo. Slaughter was hired by Apollo around June 2000. On February 6, 2003 defendants held one of a series of employee meetings to announce its new binding arbitration policy, called the Mutual Agreement Process or MAP. See Hernandez Dec. ¶¶ 3–7. In relevant part, the MAP policy Handbook explains the policy:

> MAP is a mutual agreement process. That means that you and the Company agree to use MAP as the only means of resolving employment-related disputes and to forego any right either party might have had to a jury trial on issues covered by MAP. Both you and the Company agree to resolve all legally protected claims and disputes either has with the other in accordance with this process. This means both agree to ultimately resolve these disputes by means of final and binding arbitration should efforts [through other MAP resolution mechanisms] prove unsuccessful.

MAP Policy Booklet, Hernandez Dec., Exh. 1 at 2 ("MAP Policy" or "MAP"). The Company refers to defendant STEI. Id. at 1.

Plaintiff attended the February 6th meeting and signed a form acknowledging his receipt of the policy and his agreement to be bound by it. Hernandez Dec., Exh. 3. The acknowledgment form reads as follows:

> Having received the Company's information book entitled Mutual Agreement Process that describes its alternative dispute resolution process, I acknowledge and agree to the following:
>
> 1. MAP is Company policy and I am subject to its provisions.
>
> 2. Pursuant to MAP, the Company will submit any legal disputes it has with me to mediation and/or mandatory binding arbitration.
>
> 3. Pursuant to MAP, I will submit any concerns, complaints or issues arising from my employment with the Company using the open door policy, voluntary mediation or, ultimately, mandatory binding arbitration.
>
> 4. Both the Company and I give up any right to a jury trial on issues that MAP covers.
>
> 5. Any arbitration will be conducted before an experienced arbitrator selected using MAP procedures, and it will be conducted under the Federal Arbitration Act and the procedural rules of the American Arbitration Association (AAA).
>
> 6. MAP may not be modified or rescinded unless both the Company and I sign a document expressing our mutual decision to do so.

Acknowledgment Form, Hernandez Dec., Exh. 3. Slaughter contends that he was required to sign the MAP policy as a condition of his continued employment. Slaughter Dec. ¶¶ 7–8.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    On January 10, 2007 Slaughter filed the instant complaint bringing seven different causes of

2    action for discrimination on the basis of race and disability as well as infliction of emotional distress.

3    Defendants subsequently removed the action to this court, alleging federal question jurisdiction

4    premised on plaintiff's Americans with Disabilities Act, 42 U.S.C. section 1211 et seq., claim and

5    diversity jurisdiction.  It has now filed a motion to compel arbitration.

6

7    LEGAL STANDARD

8    Arbitrability

9    Federal substantive law governs the question of arbitrability.  See Simula, Inc. v. Autoliv,

10   Inc., 175 F.3d 716, 719 (9th Cir. 1999).  Arbitration is matter of contract and the court cannot

11   require a party to arbitrate a dispute unless the party has agreed to do so.  See EEOC v. Waffle

12   House, Inc., 534 U.S. 279, 293 (2002).  The Federal Arbitration Act ("FAA") governs this

13   examination.  See 9 U.S.C. § 4.[2]  "The court's role under the FAA is limited to (1) determining

14   whether an enforceable agreement to arbitrate exists and, if it does, (2) deciding whether the

15   agreement encompasses the dispute at issue."  Chiron Corp. v. Ortho Diagnostic Systems, Inc., 207

16   F.3d 1126, 1130 (9th Cir. 2000).  If the finding is affirmative on both counts, then the FAA requires

17   the court to enforce the arbitration agreement in accordance with its terms.  Id.

18

19   DISCUSSION

20   The present dispute concerns the validity of the MAP Policy's arbitration provision.  The

21   parties do not dispute the fact that plaintiff's complaint is covered by the arbitration clause.  Instead,

22   plaintiff challenges the applicability of the Federal Arbitration Act to the present dispute. He also

23   argues that the arbitration agreement is invalid under three theories: unconscionability, lack of

24   consideration, and fraud in the inducement.  The court will consider each of these arguments in turn

25   but first addresses defendants' evidentiary objections to evidence submitted in connection with this

26   motion.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

3

UNITED STATES DISTRICT COURT
For the Northern District of California

I.        Evidentiary Objections

Defendants have lodged a number of evidentiary objections to the declarations submitted in support of plaintiff's opposition to the motion to compel arbitration.   Their first objection is a general one, applicable to each of the declarations.  Defendants object that the declarants signed under penalty of perjury under the laws of the State of California and not the laws of the United States. As plaintiff notes, defendants have also submitted declarations with similar perjury statements referencing the laws of the State of California, although their subsequently filed errata amended these parts of the defendants' declarations.  See Defs.' Notice of Errata, Apr. 19, 2007, Exh. 1–3.  Nonetheless, this objection is unfounded, as the applicable statutory provision, 28 U.S.C. section 1746, requires only substantial compliance with the statute's preferred phrasing.  See Commodity Futures Trading Comm'n v. Topworth Intern., Ltd., 205 F.3d 1107, 1112 (9th Cir. 1999) (concluding that the perjury statement must be substantially compliant with the statute).  Moreover, the applicable phrasing for statements sworn within the United States does not require a reference to the laws of the United States.  28 U.S.C. § 1746(2).  Accordingly, this objection is OVERRULED.

In each of the Thomas, Bostaw, O'Hill, Roles, and Clark declarations, the declarants describe their experiences at various MAP orientation meetings.  Defendants object to these declarations on the basis of irrelevance and lack of foundation.  First, they contend that declarants' observations about MAP orientations meetings are irrelevant because none of the declarants attended the same February 6, 2003 meeting as Slaughter.  The statements about the MAP orientation meetings that Slaughter did not attend are relevant here for determinations of procedural unconscionability.  Where defendants conducted several meetings on the MAP, declarants' statements about the nature of other meetings bears on the February 6th meeting.  To the extent that these meetings were conducted in a manner supporting a finding of procedural unconscionability, evidence about them tends to make it more probable than not that the February 6th meeting would support a similar finding.  See Fed. R. of Evid. 401.  Defendants' second objection is inapposite: the declarants make no statements about the February 6th meeting.  Furthermore, the declarants attest to

**UNITED STATES DISTRICT COURT**
For the Northern District of California

their own experiences with the MAP meetings of which they have personal knowledge. These objections are OVERRULED.

Defendants object to six statements in the Slaughter declaration on various grounds. Based on the portions of the Slaughter declaration considered in the following order, the court need only consider the objections to Slaughter's statement that "[r]epeatedly we were told that we must sign the MAP policy or be fired." Slaughter Dec. ¶ 8. Defendants contend that Slaughter lacks personal knowledge for the statement; that he fails to specify the circumstances in which he was told this information; and that he improperly purports to speak for others. However, the declaration is clear that the statement is based on Slaughter's own experience at the February 6th meeting. Id. ¶ 8. Read carefully, the statement merely refers to the fact that he was one of many people attending the meeting. Id. Therefore, this objection to the Slaughter declaration is OVERRULED.

Defendants also raise objections to six statements in the Thomas declaration, one of which the court addressed previously. The court has relied on none of the disputed statements. Therefore, it will not address those objections. For similar reasons, the court will not address the three objections raised to the Gifford Declaration or the two remaining objections to the Clark declaration.

II.    Interstate Commerce Requirement

The instant action involves a novel question of law: whether the FAA's regulation of a "contract evidencing a transaction involving commerce" reaches activity that is confined to one state by state regulation and is governed solely by state regulation. 9 U.S.C. § 2. Plaintiff contends that the FAA is not applicable and that his employment contract does not involve interstate commerce as required by the statute because he was employed at a single location, the Emeryville, California crematory. Slaughter Dec. ¶ 2–3. His employment did not require interstate travel. Id. Moreover, California law prohibits one from carrying the deceased across state lines without a license. Cal. Health & Safety Code § 7055. He is not so licensed. Id. ¶ 4. Plaintiff contends that his activities while employed with defendants as well as the events at issue in the underlying suit were confined to California, and, accordingly, were not a part of interstate commerce. Id. ¶ 5.

5

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The FAA reaches the outer extremities of Congress's powers under the Commerce Clause.

2   Perry v. Thomas, 482 U.S. 483, 490 (1987) (The Act "embodies Congress' intent to provide for the

3   enforcement of arbitration agreements within the full reach of the Commerce Clause.").  In

4   Allied-Bruce Terminix Companies, Inc. v. Dobson, the Court adopted the commerce-in-fact test for

5   determining whether the relevant transaction in fact involved interstate commerce.  513 U.S. 265,

6   281 (1995).  In its most recent pronouncement on this issue, the Court refined the test: rather than

7   evaluating the individual transaction at issue in isolation, the FAA extends to those activities which,

8   "in the aggregate . . . would represent 'a general practice . . . subject to federal control.'"  Citizens

9   Bank v. Alafabco, Inc., 539 U.S. 52, 53 (2003) (quoting Mandeville Island Farms, Inc. v. Amer.

10  Crystal Sugar Co., 334 U.S. 219, 236 (1948)).  The required nexus to interstate commerce occurs at

11  a high level of abstraction.  Indeed, "[o]nly that general practice need bear on interstate commerce in

12  a substantial way."  Alafabco, 539 U.S. at 53.  While Alafabco illuminates the proper scope of the

13  inquiry, it provides little guidance for determining what type of economic activity bears on interstate

14  commerce.  The Court seems to say that the FAA applies to all activities which Congress could

15  regulate pursuant to its Commerce Clause powers.

16      Despite assertions by scholars and courts that the commerce power knows no limits, the

17  Court reiterated in Alfabco that the limits are not hypothetical.  539 U.S. at 58; see also United

18  States v. Morrison, 529 U.S. 598, 608 (2000) ("[E]ven under our modern, expansive interpretation of

19  the Commerce Clause, Congress' regulatory authority is not without effective bounds.").  The court

20  must determine where those limits are and whether this contract crosses them.  In concluding that

21  the FAA applies to certain debt-restructuring contracts, the Alafabco court relied on the out-of-state

22  uses of the proceeds from the underlying loans as well as the fact that the loans were secured by the

23  debtors' assets, including inventory assembled from out-of-state parts.  Id. at 57.  The aggregate

24  impact of commercial lending on the national economy was further support for the conclusion that

25  these purely intrastate loans and the resulting debt restructuring agreements met the commerce-in-

26  fact test.  Id. at 57–58.  That logic does not lend itself to ready application here.  Unlike debt-

27  restructuring contracts involving a manufacturer, Slaughter's contract was for service type

28

6

1    employment that occurred solely within the state and did not involve handling of goods that traveled

2    in interstate commerce.  Moreover, the local nature of the crematory industry, which is licensed and

3    controlled by the states, suggests that this contract may be one of the few located in the narrow

4    territory beyond the reaches of the Commerce Clause.  The court must begin its analysis with a

5    review of the limits of the Commerce Clause.

6

7        A.    Commerce power and its limits

8        Pursuant to its commerce power, Congress can regulate three types of activities: the use of

9    channels of interstate commerce, the instrumentalities of interstate commerce, and activities that

10   have a substantial relation to interstate commerce.  Lopez, 514 U.S. at 558.  The reach of the third

11   category of regulated activities has been the focus of three recent Supreme Court cases.  United

12   States v. Lopez, 514 U.S. 549 (1995); United States v. Morrison, 529 U.S. 598 (2000); Gonzales v.

13   Raich, 545 U.S. 1 (2005).  In these cases, the Supreme Court delineated some limits to the

14   commerce power.

15       The clearest line drawn in the Commerce Clause jurisprudence is between economic and

16   non-economic activity.  In both Lopez and Morrison, the Court invalidated statutes based on the

17   non-economic nature of the regulated activity.  See Lopez, 514 U.S. at 561 (holding that the statute

18   in question "was a criminal statute that by its terms has nothing to do with 'commerce' or any sort of

19   economic activity, however broadly one might define those terms"); Morrison, 529 U.S. at 613

20   ("Gender motivated crimes of violence are not, in any sense of the phrase, economic activity.").  By

21   contrast, the Court concluded that the regulation of illegal drugs did reach economic activity.  The

22   distinction there rested on the notion that marijuana was a fungible good for which there is an

23   established interstate market.  Gonzales v. Raich, 545 U.S. 1, 18 (2005).  In doing so, the Raich

24   court relied upon a definition of the term "economic" as "the production, distribution, and

25   consumption of commodities."  Id. at 25.

26       Here, the relevant market is that for labor, which is considered by some economists to be a

27   commodity within the meaning of the definition provided in Raich.  Certainly, the labor market is

28

7

1 considered to be economic activity.  Moreover, the FAA undisputedly reaches some employment

2 contracts.  See  Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 110–12 (2001) (reasoning that

3 section 2 of the FAA covers all contracts, including all employment contracts, consistent with the

4 full reach of Congress's power pursuant to the Commerce Clause).  However, this presents a further

5 question: Are all employment contracts part of interstate commerce by virtue of their connection to

6 the labor market?  See Morrison, 529 U.S. at 615 (considering nexus of disputed statute with

7 reference to that argument that the "nationwide, aggregate impact [of the regulated activity] has

8 substantial effects on employment"); but see Bernhardt v. Polygraphic Co. of Am., 350 U.S. 198,

9 200–01 (1956) (noting that the employment contract at issue did not involve commerce pursuant to

10 the meaning of the FAA[3]).  It cannot be true that all employment relationships necessarily involve

11 interstate commerce.  Indeed, Title VII's jurisdictional statement suggests that there must be some

12 employment contracts beyond its reach and by inference beyond the reach of the Commerce Clause.

13 See 42 U.S.C. § 2000e(b) (Title VII applies to employers, defined as "a person engaged in an

14 industry affecting commerce who has fifteen or more employees.); Martin v. United Way of Erie

15 County, 829 F.2d 445, 448 (3d Cir. 1987) (Title VII encompasses the "the fullest jurisdictional

16 breadth constitutionally permissible under the Commerce Clause.").

17 　　　　The economic nature of an activity is not the sole limit on the commerce power.  It is not the

18 case that any activity that could potentially be characterized as economic may be regulated.  "The

19 Constitution requires a distinction between what is truly national and what is truly local."  Morrison,

20 529 U.S. at 618.  However, the distinguishing principle is far from clear in existing precedent.  In

21 some contexts, local activity appears to refer to areas of traditional state control; in others, local

22 refers to the economic scope of the activity.  The Lopez court expressed the former principle.  It

23 articulated a concern with expansive readings of the Commerce Clause that would permit Congress

24 erroneously to regulate "even in areas such as criminal law enforcement or education where States

25 have historically been sovereign."  Lopez, 514 U.S. at 564.  In Raich, the Court substituted the state

26 sovereignty reading of local for a narrower, economic one.  It rejected the notion that California's

27 regulation of medical marijuana segregated it from interstate commerce.  "The notion that California

28

8

1   law has surgically excised a discrete activity that is hermetically sealed off from the larger interstate

2   marijuana market is a dubious proposition, and, more importantly, one that Congress could have

3   rationally rejected." <u>Raich</u>, 545 U.S. at 30.  This analysis focuses not on the history of state control

4   but on the fundamental forces of supply and demand which cross state lines.

5           In the instant action, the relevant industry satisfies both of these readings.  The death care

6   industry generally and the crematory sector specifically are undoubtedly economic in nature.  The

7   death care industry is a multi-billion dollar industry.  <u>See</u> GAO, Death Care Industry: Regulation

8   Varies across States and by Industry Segment 2 (Aug. 2003).  These industries, however, tend to be

9   local in both the state sovereignty and the economic meanings of the term.  First, state licensing of

10  funeral homes and crematories is pervasive.  <u>See id.</u> at 8 ("A majority of states regulate crematories

11  and require crematories to be licensed to operate in their state, but fewer require crematory operators

12  to be licensed.").  California has one of the most comprehensive licensing regimes; the state requires

13  licenses for crematories and crematory operators as well as funeral establishments, funeral directors,

14  and embalmers.  <u>Id.</u> at 26; <u>see</u> Cal. Bus. & Prof. Code § 9787 (licensing requirement for crematories

15  and their operators).  Indeed, federal regulation of death care businesses is virtually non-existent.

16  While not determinative of the local nature of the crematory industry, federal forbearance in this

17  area is notable.  Applicable federal regulation is limited to the Federal Trade Commission's Funeral

18  Rule, enacted in 1982, which requires funeral providers and crematories to make certain disclosures

19  and give customers an itemized price list.  <u>See</u> 16 C.F.R. §§ 453.1–453.9; <u>Funeral Consumer</u>

20  <u>Alliance, Inc. v. FTC</u>, 2007 WL 1051575, *1 (D.C. Cir. 2007) (reviewing the history of the Funeral

21  Rule).  Aside from this rule, there is no comprehensive regulatory regime for this industry.  Indeed,

22  the most recent legislative proposal for nationwide regulation of funeral homes, crematories and

23  their similar facilities was a conditional spending program pursuant to the Spending Clause.  <u>See</u>

24  Federal Death Care Inspection and Disclosure Act, S. 3168, 108th Cong. (2004).  The various

25  regulatory and licensing regimes and the absence of federal regulation suggest that this economic

26  activity is not interstate.  As plaintiff points out, he is legally forbidden from crossing state lines to

27  perform his job.  Thus, by virtue of the traditional role of state regulation and federal forbearance,

28

this industry meets the state sovereignty definition of local to which the <u>Lopez</u> court referred.

The crematory sector also appears to meet <u>Raich</u>'s economic definition of what is local. California's licensing of these businesses, like those of many other states, does not represent an artificial attempt to seal off a portion of the larger interstate market.  <u>Raich</u>, 545 U.S. at 30. Rather, the economic realities of an industry that addresses the needs of the deceased is by its nature time-sensitive and geographically constrained.  The attendant health and safety aspects of this industry, some of which may be geographically specific, also weigh in favor of local regulation.  In an economic sense, the services performed by the death care industry are not fungible and are geographically fixed.  <u>Cf.</u> <u>Raich</u>, 545 U.S. at 18.  The existence of national companies, like defendant STEI, which own crematories in multiple states, does not undermine the conclusion that the activity is confined to local markets.  Techniques of modern finance may result in conglomerations of businesses, some of which operate exclusively in local markets.  However, the reaches of the Commerce Clause are not defined by the accidents of ownership.  The court can find no evidence that there exists a large, interstate market for crematory services or that the economics of the industry suggest otherwise.

B.    <u>Incidental effects on intrastate activity</u>

While the court has concluded that the employment crematory sector is intrastate activity, that determination does not end the inquiry.  Commerce Clause jurisprudence has long permitted incidental regulation of intrastate commerce, where the intermingling of interstate and intrastate commerce required.  <u>See, e.g.</u>, <u>Shreveport Rate Cases</u>, 234 U.S. 342 (1914); <u>see also</u> <u>Wickard v. Fillburn</u>, 317 U.S. 111, 128–29 (1942) ("Even if [the disputed] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce.").  The focus of the incidental effects analysis is on the nature of the regulatory scheme at issue.  Where a federal regulatory scheme would be undercut by failure to regulate the intrastate activity, Congress may regulate the local activity without exceeding the restraints of the Commerce Clause.  <u>Lopez</u>, 514 U.S. at 561 (Regulation of intrastate activity is permissible where it is one of the "essential parts of a larger regulation of

11

1   economic activity" and the "regulatory scheme could be undercut unless the intrastate activity were

2   regulated.").

3          The relevant statutory regime here is the FAA.  By its terms, the FAA addresses individual

4   transactions.  9 U.S.C. § 2 (applying the terms of the act to "a written provision in any maritime

5   transaction or contract evidencing a transaction involving commerce").  Therefore, the regulatory

6   scheme does not encompass wide sectors of economic activity in a general fashion but rather applies

7   to individual transactions or contracts.  Putting aside the statutory requirement that the transactions

8   themselves "involv[e] commerce,"[4] it is difficult to conclude that contracts evincing intrastate

9   commerce are necessarily part of the regulatory scheme.  Similarly, failure to enforce arbitration

10  provisions in purely intrastate contracts would not subvert the entire statutory scheme in the same

11  way as the failure to regulate purely intrastate marijuana production.  Raich, 545 U.S. at 26.  Thus,

12  severability of the interstate and intrastate activities in the FAA make the incidental effects analysis

13  different from that presented in Raich.  545 U.S. at 22 (declaring "[t]hat the regulation ensnares

14  some purely intrastate activity is of no moment."); Maryland v. Wirtz, 392 U.S. 183, 197, n.27

15  (1968) ("The Court has said only that where a general regulatory statute bears a substantial relation

16  to commerce, the de minimis character of individual instances arising under that statute is of no

17  consequence.").  Because the effects of applying the FAA to intrastate activity are not incidental, the

18  court cannot conclude that a rational basis exists for regulating purely intrastate activities.  Raich,

19  545 U.S. at 22.  Indeed, the intrastate activities at issue in the disputed contract are not incidental but

20  central.   Thus, the FAA does not apply to purely intrastate activities such as the crematory sector.

21         Similar to the FAA, Title VII and the ADEA reach the full extent of Congress's powers

22  under the Commerce Clause.  See  EEOC v. Ratliff, 906 F.2d 1314, 1316 (9th Cir. 1990); Martin v.

23  United Way of Erie County, 829 F.2d 445, 448 (3d Cir. 1987) "([W]hen Congress expressly

24  incorporated into Title VII and the ADEA the definition of 'affecting commerce' from the labor

25  laws,  the term 'affecting commerce' had been interpreted as vesting in the National Labor Relations

26  Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause.")

27  (citations and quotations omitted).  Despite the local nature of the funeral home industry, like that of

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    the crematory sector, courts have routinely upheld Title VII and ADEA challenges in those

2    industries. <u>See e.g.</u>, <u>Wells v. SCI Management, L.P.</u>, 469 F.3d 697, 703 (8th Cir. 2006) (evaluating

3    Title VII gender discrimination claim brought by funeral director against her employer); <u>EEOC v.</u>

4    <u>Warfield-Rohr Casket Co., Inc.</u>, 364 F.3d 160, 161–62 (4th Cir. 2004) (reviewing grant of summary

5    judgment in an ADEA case brought by casket trimmer against his employer); <u>Karnes v. SCI</u>

6    <u>Colorado Funeral Services, Inc.</u>,162 F.3d 1077, 1078 (10th Cir. 1998) (considering a judgment

7    awarding compensatory and punitive damages under Title VII for discrimination brought by funeral

8    home employee).  Additionally, courts have applied these statutes to employers in the industry who

9    operate exclusively within a single state.  <u>See, e.g.</u>, <u>Heights Funeral Home, Inc. v. NLRB</u>, 385 F.2d

10    879, 880 (5th Cir. 1967) (applying National Labor Relations Act to employer and its affiliates,

11    which own and operate three funeral homes in Houston, Texas with less than fifty employees).[5]

12    While none of these courts considered a Commerce Clause challenge, it is significant that courts

13    have applied these statutes in similar contexts.  The nature of the crematory industry appears not to

14    have dissuaded other courts from entertaining similar challenges.

15         Nonetheless, the court finds that the FAA does not apply to the MAP policy as part of

16    Slaughter's employment contract.   The court will now look to the enforcement of the arbitration

17    agreement under California law.   <u>See Ingle</u>, 328 F.3d at 1170 (evaluating validity of arbitration

18    clause under the law of the state where plaintiff was employed);  <u>Ticknor v. Choice Hotels Int'l, Inc.</u>,

19    265 F.3d 931, 937 (9th Cir.2001) (applying Montana law in deciding whether arbitration clause was

20    valid).

21

22    III.     <u>Validity of the Arbitration Agreement</u>

23         Plaintiff raises three challenges to the validity of the arbitration agreement.  First, he argues

24    that the MAP is unconscionable.  Second, he argues that the agreement is unenforceable for lack of

25    consideration.  Finally, he contends that the agreement is tainted by virtue of fraud in the

26    inducement.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A.    Unconscionability

Plaintiff argues that the MAP is invalid because it is unconscionable.  Under California law, an arbitration agreement must be both procedurally and substantively unconscionable to be invalid. Armendariz v. Foundation Health Psychcare Servs., Inc., 24 Cal. 4th 83, 114 (2000); see also Circuit City Stores, Inc. v. Mantor, 335 F.3d 1101, 1105 (9th Cir. 2003).  Procedural unconscionability exists when there is oppression or surprise in an agreement because of unequal bargaining power. Armendariz, 24 Cal. 4th at 114.  Substantive unconscionability exists when there are overly-harsh or one-sided results.  Id.  The court applies a sliding scale that assesses procedural unconscionability in proportion to substantive unconscionability: "The more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."  Id.

1.    Procedural Unconscionability

A determination of procedural unconscionability is based on the manner a contract was negotiated and the parties' circumstances at that time.  Mantor, 335 F.3d at 1106.  The court examines two factors when examining the procedural unconscionability of a contract: oppression and surprise.  Id.  Oppression arises when there is an unequal balance of bargaining power between the parties to a contract which precludes the weaker party from enjoying a meaningful opportunity to negotiate the terms of the contract.  Id.  Surprise arises when the terms to which the parties allegedly agreed are "hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms."  Id. (quoting Stirlen v. Supercuts, Inc., 51 Cal. App. 4th 1519, 1532 (1997)).

Plaintiff presents two bases for finding that the arbitration agreement is procedurally unconscionable.  First, Slaughter asserts that the MAP policy is a contract of adhesion because it was presented to him on a take-it-or-leave-it basis.  He also contends that the agreement was a result of unequal bargaining power between the parties resulting in oppression.

Procedural unconscionability analysis first asks whether a contract is one of adhesion because a finding of adhesion is essentially a finding of procedural unconscionability.  Nagrampa v.

14

UNITED STATES DISTRICT COURT
For the Northern District of California

Mailcoups, Inc., 469 F.3d 1257, 1281 (9th Cir. 2006) (citing Flores v. Transamerica HomeFirst, Inc., 93 Cal. App. 4th 846, 853 (2001)). A contract of adhesion is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." Ting v. AT&T, 319 F.3d 1126, 1148 (9th Cir. 2003). Here, Slaughter submits evidence based on his experience at the MAP orientation meeting. He states that at the February 6th meeting, "[Human Resources Manager] Caroline Hernandez indicated that if we did not sign the MAP agreement, we would no longer have a job." Slaughter Dec. ¶ 6. "Repeatedly, [the employees attending the meeting] were told that we must sign the MAP policy or be fired." Id. ¶ 8. He believed that he "had no choice [but] to sign the MAP policy in order to be able to continue to support [his] family." Id. ¶ 7. Several of Slaughter's co-workers who attended similar meetings also left with the same impression: that agreeing to the MAP policy was a condition of employment. See Bostaw Dec. ¶ 3 (At a meeting, "[she] was given a copy of the Mutual Agreement Process arbitration agreement and informed that [she] must sign it, as it was the new company policy, if [she] wanted to continue working for the company."); O'Hill Supp. Dec. ¶ 4 (At a February 2003 meeting, "[he] was told by company representatives that if [he] did not sign the MAP agreement, then [he] would not have a job."). Moreover, the MAP Booklet explicitly states that "[t]he benefits of the Mutual Agreement Process (MAP) are provided as a condition of your continued employment with the Company."). MAP Policy, at 1. Defendants do not dispute that the MAP Policy was a condition of Slaughter's continued employment. Defs.' Reply at 5. Indeed, the Ninth Circuit has noted that it may be procedurally unconscionable "to require employees, as a condition of their employment, to waive their rights to seek redress of grievances in a judicial forum." Ingle v. Circuit City Stores, Inc. 328 F.3d 1165, 1172 (9th Cir. 2003). The court finds that the agreement was offered on a take-it-or-leave-it basis. Accordingly, the court is satisfied that the agreement was procedurally unconscionable.

2.      Substantive Unconscionability

A determination of substantive unconscionability turns on the existence of overly-harsh or one-sided results. Nagrampa v. Mailcoups, Inc., 469 F.3d 1257, 1280 (9th Cir. 2006). A contract

1   may provide extra protection to the superior party without being unconscionable, but that party's

2   need for the advantage must be explained in the contract or be factually established.  Ingle, 328 F.3d

3   at 1173.  To determine substantive unconscionability, the court will apply the "shocks the

4   conscience" standard of unconscionability—contract terms so one-sided as to shock the conscience.

5   Id. at 1172.

6        The key consideration in finding substantive unconscionability is a lack of mutuality.

7   Nagrampa, 469 F.3d at 1281 (citing Abramson v. Jupiter Networks, Inc., 115 Cal. App. 4th 638, 651

8   (2004)).  Arbitration agreements must contain at least a modicum of bilaterality, or else "arbitration

9   appears less as a forum for neutral dispute resolution and more as a means of maximizing employer

10  advantage."  Armendariz, 24 Cal. 4th at 118.  The parties' dispute on the issue of substantive

11  unconscionability in the arbitration agreement concerns one provision of the MAP policy, which

12  plaintiff contends permits defendants to unilaterally change the terms of the agreement.  The

13  relevant portion of the policy states:

14       The Company will not modify or change the agreement between you and the Company to use
         the mandatory binding arbitration to resolve employment-related disputes without notifying you
15       and obtaining your consent to such changes.  However, the Company may change or modify
         the procedures from time to time without advance notice and without your consent.
16

17  MAP, at 7.  Defendants contend first that the modification provision does not relate to the mandatory

18  binding arbitration but instead to the non-arbitration procedures mentioned in the MAP.  Next, they

19  argue that even if the modification provision were to apply to the arbitration procedures, this would

20  not render the arbitration agreement unconscionable.  California courts have held that similar

21  modification provisions—even where they grant an employer the unilateral right to modify the terms

22  of the contract without providing advance notice—are not substantively unconscionable.  See 24

23  Hour Fitness, Inc. v. Superior Court, 66 Cal. App. 4th 1199, 1214 (1998).  The 24 Hour Fitness court

24  reasoned that a similar contract was not illusory because the modification provision was limited by

25  the duty to exercise the right of modification fairly and in good faith.  Id.  Thus, as a matter of law,

26  the modification provision does not render the arbitration agreement unconscionable.

27        Two additional considerations, not addressed by the parties, go to whether the agreement

28

16

UNITED STATES DISTRICT COURT
For the Northern District of California

lacks mutuality: the availability of statutory rights and the applicable statute of limitations.  It

appears that the MAP has carved out EEOC proceedings as well as proceedings before state

agencies with concurrent jurisdiction from the arbitration agreement   In the Question and Answer

section, the policy states that "MAP does not cover any issues dealing with claims for worker's

compensation benefits, unemployment compensation, the construction or application of a benefit

plan covered by the Employee Retirement Income Security Act (ERISA) or any other non-waivable

statutory claim. . . ." MAP at 7.  The section also states that a complaint to the EEOC is still

available, but "after investigation, the determination of the EEOC is to issue a 'Right to Sue' letter,

then you must use mediation and/or arbitration as a means to resolve the matter." Id. at 8.  This

carve-out comports with the Ninth Circuit's recent pronouncement in Davis v. O'Melveny & Myers.

485 F.3d 1066, 1081–84 (9th Cir. 2007).   It is not an "all inclusive bar to administrative actions"

because it permits plaintiff to file an EEOC charge and for the agency's investigation to run its

course. Id. at 1082.

    The second issue—that related to the statute of limitations—does not establish substantive

unconscionability.  The MAP provides that

> any dispute or claim involving a protected legal right that the employee or Company wishes to
> pursue through mediation or arbitration must be brought within the time period provided by
> statute for initiating such claims in a court of law or with the appropriate regulatory agency,
> such as the Equal Employment Opportunity Commission (EEOC).  A request for arbitration
> must be filed within 30 days after either the termination of an unsuccessful mediation of the
> same claim or the rendering of the final decision in accordance with the Open Door Policy,
> whichever is later.

MAP at 6.  This provision permits plaintiff to file a complaint with the EEOC within the statutorily

required time frame.  If the EEOC issues a right to sue letter, plaintiff has ninety days, in accordance

with EEOC policy, to file suit in district court.  Under the MAP provision, however, plaintiff would

have to initiate mediation or arbitration rather than file suit.  Id. If the MAP provision is construed

to allow ninety days within which to proceed to mediation or arbitration, it does not shorten the

statute of limitations period and is consistent with O'Melveny.  485 F.3d at 1076–78.[6]  However, if

the statute of limitations provision is construed to be shorter than that described above, this court

may revisit its unconscionability analysis and upon appropriate application by plaintiff.

17

California law requires both procedural and substantive unconscionability in order to render an agreement unenforceable. Armendariz, 24 Cal. 4th at 114 (citing Stirlen, 51 Cal. App. 4th at 1533). Having rejected plaintiff's substantive unconscionability argument, the court must conclude that the agreement is not unconscionable provided the statute of limitations provision is construed as set forth above.

B.     Consideration

Slaughter also argues that the contract is invalid because there was no consideration for the arbitration agreement other than a continuation of his employment. While this argument does not bear on whether the contract is unconscionable, the lack of consideration, as a general defense to contract formation, may invalidate an arbitration agreement. In evaluating an identical argument under California law, the Ninth Circuit held that an employer's promise to be bound by the arbitration process serves as adequate consideration. Circuit City Stores, Inc. v. Najd, 294 F.3d 1104, 1108 (9th Cir. 2002) ("In other words, Circuit City's promise to submit to arbitration and to forego the option of a judicial forum for a specified class of claims constitutes sufficient consideration."). The MAP Policy states that both employees and the defendants "agree to use MAP as the only means of resolving employment-related disputes and to forego any right either party might have had to a jury trial on issues covered by MAP." MAP, at 2. Therefore, the court finds that there was adequate consideration for the arbitration agreement.

C.     Fraud in the Inducement

Finally, Slaughter contends that his signature on the agreement was obtained by fraud because defendants have not performed and never had an intention to perform their obligations under the agreement. Defendants object to this argument, contending that there is no evidence of fraud in the inducement. They also argue that this court should not consider a claim of fraud in the inducement because it is properly the subject of arbitration.

Where a claim of fraud in the inducement is directed at the disputed contract rather than the

18

at the arbitration clause, the issue is subject to arbitration.  Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street, 35 Cal.3d 312, 323–24 (1983); see also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403–04 (1967) ("[I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it.").  Defendants contend that plaintiff's argument is directed at the entire MAP policy rather than the applicable arbitration clause.  However, this assertion is a mischaracterization of the rule.  The reference to a claim of fraud directed at the contract in Ericksen was to the lease agreement that was the subject of the underlying dispute.  35 Cal. 3d at 324.  Here, the only contract at issue is the arbitration agreement as presented in the MAP Policy and Acknowledgment Form provisions relating to arbitration. The underlying dispute concerns plaintiff's allegations of discrimination. Thus, for the purposes of plaintiff's fraud in the inducement claim, the arbitration provisions are those contained in the MAP Policy.  Defendants are correct that the provisions of the MAP Policy relating to the Open Door Policy and other pre-arbitration dispute resolution mechanisms are not considered part of the arbitration clause for the purposes of the fraud analysis.

Plaintiff has not submitted sufficient evidence for this court to determine that there was fraud in the inducement.  Fraud in the inducement occurs when "the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable."  Hotels Nevada v. L.A. Pacific Center, Inc., 144 Cal. App. 4th 754, 763 (2006).  It is notable that the plaintiff argues both that he was forced to sign the arbitration agreement for the purposes of his unconscionability argument and that he mutually assented to the agreement, induced by defendants' promise to arbitrate.  Nonetheless, plaintiff has failed to provide any evidence that defendants' did not intend to perform their promise to arbitrate at the time the promise was made.  See O'Mary v. Mitsubishi Elec. Am. Inc., 59 Cal. App. 4th 563, 579 (1998).  Accordingly, the court rejects plaintiff's argument that the arbitration clause suffered from fraud in the inducement.

In sum, having concluded that the arbitration agreement is valid under California law,

19

UNITED STATES DISTRICT COURT
For the Northern District of California

1    the court GRANTS the motion to compel arbitration.

2

3    CONCLUSION

4        Defendants' motion to compel arbitration is GRANTED.

5

6    IT IS SO ORDERED.

7

8    Dated:  August 1, 2007

9                                                          _____

10                                                        MARILYN HALL PATEL
                                                          United States District Court Judge
11                                                        Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

ENDNOTES

1. Unless otherwise noted, all facts are taken from the Complaint.

2.  The FAA states that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.

3. The factual description of the employment contract provided in the Bernhardt opinion is limited: "At the time the contract was made petitioner was a resident of New York. Respondent is a New York corporation. The contract was made in New York. Petitioner later became a resident of Vermont, where he was to perform his duties under the contract, and asserts his rights there." Bernhardt, 350 U.S. at 199.  The lower court opinion reveals that the contract related to an employee who was the supervisor of a lithographic plant in Vermont.  Bernhardt v. Polygraphic Co. of America, 218 F.2d 948, 949 (2d Cir. 1955).

4.  The Alafabco court seemingly eschewed a reading of the statute that would require the particular transaction or contract at issue to have a nexus to interstate commerce.  Rather, "[o]nly th[e] general practice need bear on interstate commerce in a substantial way." Alafabco, 539 U.S. at 53.  This reading of the FAA would reach intrastate commerce that met the incidental effects test but did not in fact have nexus to interstate commerce.

5.  In a non-precedential decision, the Third Circuit also considered the Title VII claims of two licensed funeral directors against an employer partnership that operated eight funeral homes with thirteen funeral directors.  Colussi v. Woodruff Family Services, LLP,  2006 WL 565655 at *1 (3d Cir. 2006).

6. Even if plaintiff chooses mediation and it ends unsuccessfully, he has an additional thirty days to request arbitration.  This does not adversely affect the limitations period.  MAP at 6.